## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ILHAM NASSIR IBRAHIM, *et al.*,        :
                                        :
          Plaintiffs,                   :
                                        :
     v.                                 :  Civil Action No. 04-1248 (JR)
                                        :
TITAN CORPORATION, *et al.*,            :
                                        :
          Defendants.                   :

### MEMORANDUM

Plaintiffs sue seeking compensation from two private government contractors for alleged acts of torture inflicted upon them at the Abu Ghraib prison in Iraq.  Defendants move to dismiss on a number of grounds.  Their motion must be granted as to most counts.  It will be denied however, as to several of plaintiffs' common law claims.

### Background

Plaintiffs are seven Iraqi nationals who allege that they or their late husbands were tortured while detained by the U.S. military at the Abu Ghraib prison in Iraq.  Defendants are private government contractors who provided interpreters (Titan) and interrogators (CACI) to the U.S. military in Iraq. Plaintiffs apparently concede that they cannot sue the U.S. Government because of sovereign immunity.

Plaintiffs' allegations are broad and serious.  They assert that defendants and/or their agents tortured one or more of them by: beating them; depriving them of food and water;

subjecting them to long periods of excessive noise; forcing them
to be naked for prolonged periods; holding a pistol (which turned
out to be unloaded) to the head of one of them and pulling the
trigger; threatening to attack them with dogs; exposing them to
cold for prolonged periods; urinating on them; depriving them of
sleep; making them listen to loud music; photographing them while
naked; forcing them to witness the abuse of other prisoners,
including rape, sexual abuse, beatings and attacks by dogs;
gouging out an eye; breaking a leg; electrocuting one of them;
spearing one of them; forcing one of them to wear women's
underwear over his head; having women soldiers order one of them
to take off his clothes and then beating him when he refused to
do so; forbidding one of them to pray, withholding food during
Ramadan, and otherwise ridiculing and mistreating him for his
religious beliefs; and falsely telling one of them that his
family members had been killed.

　　　　Plaintiffs assert claims under the Alien Tort Statute,
RICO, government contracting laws, and the common law of assault
and battery, wrongful death, false imprisonment, intentional
infliction of emotional distress, conversion, and negligence.
The motion to dismiss generally asserts lack of jurisdiction and
failure to state a claim upon which relief can be granted.  Of
particular interest are defendants' submissions that plaintiffs'
claims present non-justiciable political questions, that "the law

of nations" under the Alien Tort Statute does not cover torture by non-state actors, and that plaintiffs' common law tort claims are preempted by the government contractor defense.

## Analysis

### Legal standard

A motion to dismiss for failure to state a claim under Rule 12(b)(6) will be granted only if it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  The complaint will be construed in the light most favorable to the plaintiff, and the plaintiff will have "the benefit of all inferences that can be derived from the facts alleged." Kowal v. MCI Communications Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994) (internal citations omitted).  On the other hand, a court may accept "neither 'inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint,' nor 'legal conclusions cast in the form of factual allegations.'" Browning v. Clinton, 292 F.3d 235, 242 (D.C. Cir. 2002) (quoting Kowal, 16 F.3d at 1275).

A motion to dismiss for lack of jurisdiction under Rule 12(b)(1) is treated like a Rule 12(b)(6) motion. E.g., Barr v. Clinton, 370 F.3d 1196, 1199 (D.C. Cir. 2004).  To survive a Rule 12(b)(1) motion, a plaintiff has the burden of establishing that

jurisdiction is proper.  <u>E.g.</u>, <u>Macharia v. United States</u>, 334
F.3d 61, 67-68 (D.C. Cir. 2003).

## <u>Alien Tort Statute Claim</u>

Plaintiffs assert that defendants violated the "law of
nations" as described in the Alien Tort Statute (ATS), 28 U.S.C.
§ 1350.  The ATS provides: "The district courts shall have
original jurisdiction of any civil action by an alien for a tort
only, committed in violation of the law of nations or a treaty of
the United States."  In <u>Sosa v. Alvarez-Machain</u>, 124 S. Ct. 2739
(2004), the Supreme Court settled an old question by announcing
that the ATS confers jurisdiction but does not create a cause of
action.  The <u>Sosa</u> decision also made it clear that, in limited
circumstances, aliens can look to the "law of nations" for a
federal common law cause of action.  <u>Id.</u>

The ATS was first enacted as part of the Judiciary Act
of 1789.  The only "violation[s] of the law of nations" known at
that time were "violation of safe conducts, infringement of the
rights of ambassadors, and piracy."  <u>Id.</u> at 2761.  New claims may
be recognized under common law principles, but they must "rest on
a norm of international character accepted by the civilized world
and defined with a specificity comparable to the features of the
18th-century paradigms we have recognized."  <u>Id.</u> at 2761-62.  The
Court in <u>Sosa</u> discussed five factors counseling very great
caution on this front: 1) common law judges in the past were seen

as "discovering" law, but they are now seen as making or creating law; 2) since Erie v. Tompkins, 304 U.S. 64 (1938), the role of federal common law has been dramatically reduced, and courts have generally looked for legislative guidance before taking innovative measures; 3) creating private rights of action is generally best left to the legislature; 4) decisions involving international law may have collateral consequences that impinge on the discretion of the legislative and executive branches in managing foreign affairs; and 5) there is no mandate from Congress encouraging judicial creativity in this area, and in fact there are legislative hints in the opposite direction.  See id. at 2762-63.

Plaintiffs make reference to numerous treaties and other sources of international law that strongly condemn torture. Those authorities generally address official (state) torture, and the question is whether the law of nations applies to private actors like the defendants in the present case.  The Supreme Court has not answered that question, see id. at 2766 n.20, but in the D.C. Circuit the answer is no.  In Tel Oren v. Libyan Arab Republic, 726 F.2d 774 (D.C. Cir. 1984), cert. denied, 470 U.S. 1003 (1985), victims of a 1978 terrorist attack in Israel sued a number of parties, including several private organizations, for violations of the law of nations under the ATS.  A three-judge panel unanimously dismissed the case with three separate

opinions.  Judge Edwards gave the ATS the broadest reach,[1]
generally agreeing with the Second Circuit's landmark decision in
Filartiga v. Pena-Irala, 630 F.2d 876 (2nd Cir. 1980), that acts
of official torture violate the law of nations.  See Tel-Oren,
726 F.2d at 386-87, 791.  However, Judge Edwards found no
consensus that private actors are bound by the law of nations.
Id. at 791-95.[2]  The Court of Appeals addressed the issue again
only a year later in Sanchez-Espinoza v. Reagan, 770 F.2d 202
(D.C. Cir. 1985), a case involving allegations of "execution,
murder, abduction, torture, rape, [and] wounding" by the
Nicaraguan Contras, id. at 205, stating quite clearly that the
law of nations "does not reach private, non-state conduct of this
sort for the reasons stated by Judge Edwards in Tel-Oren v.
Libyan Arab Republic, 726 F.2d at 791-96 (Edwards, J.
concurring); see also id. at 807 (Bork, J. concurring)."  Id. at
206-207.[3]

_____

[1] Judge Bork essentially found that the ATS did not provide
a private right of action on its own, that the common law allowed
for at most the three types of law of nations claims recognized
in 1789, and that virtually no international human rights law
provided a private cause of action in municipal courts. Tel-Oren,
726 F.2d at 799-823. Judge Robb found the entire matter non-
justiciable under the political question doctrine. Id. at 823-27.

[2] Judge Edwards considered the historic claim of piracy to
be one of a limited number of exceptions to this principle, but
he would not add torture. Tel-Oren, 726 F.2d at 794-95.

[3] In Tel-Oren, Judge Edwards noted that torture by private
parties acting under "color of law," as compared to torture by
private parties "acting separate from any states authority or

Plaintiffs' allegations describe conduct that is abhorrent to civilized people, and surely actionable under a number of common law theories.  After Tel-Oren or Sanchez-Espinoza, however, it is not actionable under the Alien Tort Statute's grant of jurisdiction, as a violation of the law of nations.

## Political Question Doctrine

Defendants' assertion that plaintiffs' claims are non-justiciable because they implicate political questions is rejected.  "The nonjusticiability of a political question is primarily a function of the separation of powers."  Baker v. Carr, 369 U.S. 186, 210 (1962).  The political question doctrine may lack clarity, see, e.g., Comm. of United States Citizens Living in Nicaragua v. Reagan, 859 F.2d 929, 933 (D.C. Cir. 1988), but it is not without standards.  At least one of

---

direction," would be actionable under the ATS. 726 F.2d at 793. For rather obvious reasons, however, these plaintiffs disavow any assertion that the defendants were state actors, Pls.' Opp'n to Def. CACI Mot. Dismiss at 15-16: if defendants were acting as agents of the state, they would have sovereign immunity under Sanchez-Espinoza.  As then-Judge Scalia noted in dicta, plaintiffs cannot allege that conduct is state action for jurisdictional purposes but private action for sovereign immunity purposes.  See Sanchez-Espinoza,770 F.2d at 207.  Plaintiff Hadod asserted that defendants were acting "under the color of state authority," Pl. Hadod's Proposed Supplemental Mem. L. at 7-8, but subsequently withdrew his filing.  This withdrawal eliminates the need to determine whether there is any tension between the state actor inquiry under the ATS and a similar inquiry under preemption involving an affirmative government contractor defense but not immunity.  See infra.

following must be "inextricable from the case at bar" to

implicate the doctrine:

> [1] a textually demonstrable constitutional commitment
> of the issue to a coordinate political department; or
> [2] a lack of judicially discoverable and manageable
> standards for resolving it; or [3] the impossibility of
> deciding without an initial policy determination of a
> kind clearly for nonjudicial discretion; or [4] the
> impossibility of a court's undertaking independent
> resolution without expressing lack of the respect due
> coordinate branches of government; or [5] an unusual
> need for unquestioning adherence to a political
> decision already made; or [6] the potentiality of
> embarrassment from multifarious pronouncements by
> various departments on one question.

Baker, 369 U.S. at 217; see also Vieth v. Jubelirer, 541 U.S.

267, 277-78 (2004) (citing the six Baker tests and noting that

"these tests are probably listed in descending order of both

importance and certainty").  Each case requires "a discriminating

analysis of the particular question posed, in terms of the

history of its management by the political branches, of its

susceptibility to judicial handling in the light of its nature

and posture in the specific case, and of the possible

consequences of judicial action."  Baker, 369 U.S. at 211-12.

    The Constitution's allocation of war powers to the

President and Congress does not exclude the courts from every

dispute that can arguably be connected to "combat," as the

Supreme Court's rejection of the government's separation of

powers argument in Hamdi v. Rumsfeld, 124 S. Ct. 2633, 2645-51

(2004), makes clear.  As the Ninth Circuit observed, in an action

by heirs of passengers of an Iranian civilian aircraft shot down by the U.S. military during the Iran-Iraq war, "the fact that an action is 'taken in the ordinary exercise of discretion in the conduct of war' does not put it beyond the judicial power." Koohi v. United States, 976 F.2d 1328, 1332 (9th Cir. 1992) (quoting and citing The Paquete Habana, 175 U.S. 677 (1900), and citing other cases), cert. denied, 508 U.S. 960 (1993). An action for damages arising from the acts of private contractors and not seeking injunctive relief does not involve the courts in "overseeing the conduct of foreign policy or the use and disposition of military power." Luftig v. McNamara, 373 F.2d 664, 666 (D.C. Cir. 1967).

Of course this case has some relationship to foreign relations, but "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." Baker, 369 U.S. at 211; see also Japan Whaling Ass'n v. Am. Cetacean Soc'y, 478 U.S. 221, 230-31 (1986) (allowing lawsuit to force Secretary of Commerce to declare Japan in violation of international whaling agreement); Comm. of United States Citizens Living in Nicaragua, 859 F.2d 929 (D.C. Cir. 1988) (finding "troubling" the district court refusal to adjudicate claim of infringement of personal and property rights of U.S. citizens resulting from U.S. funding of Nicaraguan Contras). Nor does defendants' effort to frame this case as a standard matter of "war reparations" successfully invoke the

political question doctrine.  Here, unlike in many other
reparations cases entangled with political questions, there is no
state-negotiated reparations agreement competing for legitimacy
with this court's rulings.  See, e.g., Am. Ins. Ass'n v.
Garamendi, 539 U.S. 396, 413 (2003) (California law on Holocaust
era claims conflicting with executive agreements between U.S. and
France, Austria, and Germany); Hwang Geum Joo v. Japan, ____ F.3d
_____, 2005 WL 1513014 (D.C. Cir. 2005) (former World War II
"comfort women" suing Japan despite prior diplomatic settlement
of claims against Japan).  The facts of this case are quite
distinct from those found to implicate the political question
doctrine in Schneider v. Kissinger, 412 F.3d 190 (D.C. Cir.
2005).  There, in a matter intertwined with Cold War decision-
making, a former National Security Advisor and the United States
itself were sued for the alleged murder and torture of a Chilean
general in 1970.  See id.  The Court of Appeals found that the
case challenged foreign policy decisions over which the courts
have no authority.  Id.  Here plaintiffs sue private parties for
actions of a type that both violate clear United States policy,
see First Am. Compl. at ¶¶ 24-28, and have led to recent high
profile court martial proceedings against United States soldiers.

Manageability problems may well emerge as the
litigation in this case proceeds, especially if discovery
collides with government claims to state secrecy.  The government
is not a party, however, and I am not prepared to dismiss

- 10 -

otherwise valid claims at this early stage in anticipation of
obstacles that may or may not arise.

**Preemption**

Defendants assert that plaintiffs' common law claims
are preempted under an extension of the government contractor
defense laid out in <u>Boyle v. United Techs. Corp.</u>, 487 U.S. 500
(1988), and expanded by <u>Koohi</u>.  Preemption in this sense means
that, even if plaintiffs' serious common law allegations are
true, there may be no remedy for them,[4] and plaintiffs' common
law claims may indeed ultimately be barred.  The government
contractor defense is an affirmative defense, however, and
defendants have not produced sufficient factual support to
justify its application.

---

[4] Defendants point to three alternative methods by which
plaintiffs might seek redress (although not from defendants
themselves): the Military Claims Act (providing compensation for
claims against the military), 10 U.S.C. § 2733; the Foreign
Claims Act (same -- but specifically for damage in foreign
countries), 10 U.S.C. § 2734; and a very general pledge by the
Secretary of Defense to compensate detainees mistreated at Abu
Ghraib. Def. Titan Mot. Dismiss at 22-23.  The first two on their
face are limited to "noncombat activities," which would make them
inapplicable here if, as defendants argue elsewhere, the
activities in question here were "combat activities."  At oral
argument, plaintiffs insisted that this court is the only forum
in which compensation is available to them. 4/21/05 Tr. at 41.
Although the State Department has also stated that relief may be
available as defendants describe, <u>see</u> U.S. Department of State,
Second Periodic Report of the United States of America to the
Committee Against Torture, Annex 1 - Part Two (May 6, 2005),
http://www.state.gov/g/drl/rls/45738.htm#part_two, the record
does not establish that any of these routes is actually viable,
and my working assumption is that it is either this court or
nothing for plaintiffs.

In <u>Boyle</u>, the estate of a Marine helicopter pilot sued a helicopter manufacturer for wrongful death caused by alleged product defects. <u>Boyle</u>, 887 U.S. at 502-03. The Supreme Court found Boyle's claims preempted as a matter of judge-made federal common law. <u>Id.</u> at 504-13. The Court first determined that "uniquely federal interests" were at stake -- the rights and obligations of the United States under its contracts, civil liability for actions taken by federal officials in the course of their duty, and federal procurement of equipment. <u>Id.</u> at 504-07. Then, the Court concluded that the application of state law liability theory presented a "significant conflict" with federal policies or interests, <u>id.</u> at 507-513, finding guidance in the "discretionary function" exception to the Federal Tort Claims Act (FTCA). <u>Id.</u> at 511-13. The Court reasoned that if the helicopter's design was a result of government policy decisions, even ones that made trade-offs between safety and combat effectiveness, liability should not be permitted. <u>Id</u>. To ensure that the design was a product of government discretionary decision-making, the Court remanded for a determination as to whether: "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." <u>Id</u>. at 512.

- 12 -

Koohi extended Boyle to a case involving combatant activities.  The FTCA bars suits against the federal government for "any claim arising out of the combatant activities of the military or naval forces, or the Coast Guard, during time of war."  28 U.S.C. § 2680(j).  In Koohi, the court looked to this combatant activities exception to the FTCA and found that one purpose of the exception "is to recognize that during wartime encounters no duty of reasonable care is owed to those against whom force is directed as a result of authorized military action."  Koohi, 976 F.2d at 1337.  Thus, guided by Boyle's reliance on the FTCA, the court found that imposing liability on the civilian makers of a weapons system used in an accidental shooting down of a civilian aircraft "would create a duty of care where the combatant activities exception is intended to ensure that none exists."  Id.; see also Bentzlin v. Hughes Aircraft Co., 833 F. Supp. 1486 (C.D. Cal. 1993).

Defendants want me to expand Boyle's preemption analysis beyond Koohi's negligence/product liability context to automatically preempt any claims, including these intentional tort claims, against contractors performing work they consider to be combatant activities.  This would be the first time that Boyle has ever been applied in this manner.  Boyle explicitly declined to address the question of extending federal immunity to non-government employees, Boyle, 487 U.S. at 505 n.1, and I will not

- 13 -

extend that immunity here.[5]  Rather, preemption under the
government contractor offense is an affirmative defense, with the
burden of proof on the defendants.  See id. at 513-14; Densberger
v. United Techs. Corp., 297 F.3d 66, 75 (2nd Cir. 2002), cert.
denied, 537 U.S. 1147 (2003); Snell v. Bell Helicopter Textron,
Inc., 107 F.3d 744, 746 (9th Cir. 1997).

        Under the first step of Boyle's analysis, I must agree
that the treatment of prisoners during wartime implicates
"uniquely federal interests."  For the second step, following
Boyle and Koohi, I will look to the FTCA for guidance on the
question of whether a suit here would produce a "significant
conflict" with federal policies or interests.  In Boyle, the
Court sought to develop a common law rule that would prevent
"state tort suits against contractors [that] would produce the
same effect sought to be avoided by the FTCA exemption."  487
U.S. at 511.  Especially because the government will eventually
end up paying for increased liability through higher contracting
prices (or through an inability to find contractors willing to
take on certain tasks), the Boyle court noted, "It makes little
sense to insulate the Government against financial liability for
the judgment that a particular feature of military equipment is

---

        [5] Immunity involves not an affirmative defense that may
ultimately be put to the jury, but a decision by the court at an
early stage that the defendant is entitled to freedom from suit
in the first place.  See Mitchell v. Forsyth, 472 U.S. 511, 523-
27 (1985).

necessary when the Government produces the equipment itself, but not when it contracts for the production." <u>Id.</u> at 512.  The inquiry then turns to whether allowing a suit to go forward would conflict with the purposes of the FTCA and whether defendants have shown that they were essentially soldiers in all but name.

The legislative history for the FTCA's combatant activities exception[6] is "singularly barren," <u>Johnson v. United States</u>, 170 F.2d 767, 769 (9th Cir. 1948), and there is little case law for guidance.  The exception seems to represent Congressional acknowledgment that war is an inherently ugly business for which tort claims are simply inappropriate.  As the Supreme Court has explained in a different context, "It would be difficult to devise more effective fettering of a field commander

_____

[6] Three other exceptions to the FTCA might theoretically apply here.  Defendants argue that the discretionary function exception, 28 U.S.C. § 2680 (a), should apply.  However, as discussed <u>supra</u>, <u>Boyle</u> established a clear three-part test, which defendants do not meet.  The rationale behind the foreign country exception, 28 U.S.C. § 2680(k), appears to be Congressional "unwilling[ness] to subject the United States to liabilities depending upon the laws of a foreign power." <u>United States v. Spelar</u>, 338 U.S. 217, 221 (1949); <u>Smith v. United States</u>, 507 U.S. 197, 210 (1993).  This concern has not been substantially discussed by either party, presents a number of very complex issues, and is not appropriately addressed without further briefing.  The exception for "assault, battery, false imprisonment, false arrest," 28 U.S.C. § 2680(h), and several other inapplicable intentional torts might also apply here.  However, the legislative history for this exception has in the past been called "sparse," <u>United States v. Shearer</u>, 473 U.S. 52, 55 (1985), and "meagre," <u>Panella v. United States</u>, 216 F.2d 622, 625 (2nd Cir. 1954) (Harlan, J.), the case law in this area is equally lacking, and neither party has mentioned this exception in briefs.

than to allow the very enemies he is ordered to reduce to
submission to call him to account in his own civil courts and
divert his efforts and attention from the military offensive
abroad to the legal defensive at home." Johnson v. Eisentrager,
339 U.S. 763, 778 (1950).  State law regulation of combat
activity would present a "significant conflict" with this federal
interest in unfettered military action.  This is true even with
regard to intentional torts, because exceptions to FTCA represent
"Governmental activities which by their very nature should be
free from the hindrance of a possible damage suit." Johnson v.
United States, 170 F.2d at 769; see also Koohi, 976 F.2d at 1335
(FTCA combatant activities exception applies even to acts that
are "deliberate rather than the result of error").  Thus, we are
brought again the question of whether defendants' employees were
essentially acting as soldiers.

      Defendants were employed by the U.S. military as
interrogators (CACI) and interpreters (Titan) in a prison in Iraq
where captured persons were detained.  Defendants assert that
their employees were essentially on "loan" to the military,
4/21/05 Tr. at 6, that these employees were "essentially . . .
integrated into the military hierarchy," id. at 29, and that the
"military's operational control over [these employees was]
total."  Def. Titan Mot. Dismiss at 6.  A "Statement of Work"
provided by Titan is consistent with the notion that Titan's
employees were soldiers in all but name, although it also

- 16 -

contains some language suggesting a contrary conclusion.[7] (CACI has not provided a statement of work.)  Other than Titan's Statement of Work, defendants' have produced nothing beyond limited assertions to meet their factual burden of showing that they are entitled to the government contractor defense.  More information is needed on what exactly defendants' employees were doing in Iraq.  What were their contractual responsibilities?  To whom did they report?  How were they supervised?  What were the structures of command and control?  If they were indeed soldiers in all but name, the government contractor defense will succeed, but the burden is on defendants to show that they are entitled to preemption.

Full discovery is not appropriate at this stage, especially given the potential for time-consuming disputes involving state secrets.  Since limited additional facts are needed, a motion for summary judgment is the right vehicle to address the issue of preemption.  I will entertain such a motion from defendants, complete with whatever supporting material they believe sufficient.  If appropriate, plaintiffs will then of

---

[7] For example, while contractors "must adhere to the standards of conduct established by the operational or unit commander," Titan Statement of Work at § C-1.8.4, they also "shall not wear any identification badge or tags that identifies them as an employee of the United States Government."  Id. at § C-1.9.2.

course be entitled to file a Rule 56(f) affidavit, and we will address any discovery at that point.[8]

## RICO Claim

Plaintiffs' claims under RICO could be dismissed for a number of reasons, but it is sufficient to note here that plaintiffs do not have standing.  A plaintiff seeking RICO standing must allege damage to "business or property." 18 U.S.C. § 1964(c).  Allegations of personal injuries alone are not sufficient.  Burnett v. Al Baraka Inv. & Dev. Corp., 274 F. Supp. 2d 86, 100-02 (D.D.C. 2003).  Plaintiffs allege that U.S. Military forces seized $400 and a weapon from plaintiff Hadod, First Am. Compl. at ¶ 40, but plaintiffs' counsel concede that they can allege no acts involving defendants that go beyond personal injury.  Pls.' Opp'n to Def. Titan's Mot. Dismiss at 27-28.

## Government Contracting Law Claim

Plaintiffs' claims under various laws regulating U.S. government contracts must be dismissed.  First, plaintiffs do not attempt to challenge defendants' assertion that these laws provide no private right of action.  Second, insofar as plaintiffs attempt in their opposition to somehow restyle this

---

[8] I note that Al Rawi v. Titan Corporation (05-cv-1165) has just been transferred to this Court and deals with substantially the same issues as the present case.  I will be setting a status conference for all parties in both that case and this case, at which time I will set a briefing schedule for motions in both cases.

portion of their complaint as presenting a "claim for equitable
relief" through RICO, <u>see, e.g.</u>, Pls.' Opp'n to Def. Titan's Mot.
Dismiss at 31-33, I need only note that I am dismissing
plaintiffs' RICO claims.  Finally, plaintiffs have failed to join
an indispensable party (the United States) in this claim.  <u>See</u>
Fed. R. Civ. P. 12(b)(7), 19.

**False Imprisonment and Conversion Claims**

Although most of plaintiffs' common law claims may
proceed as provided above, the false imprisonment and conversion
claims will be dismissed.  As discussed above, the only factual
allegation that could conceivably support conversion involves the
U.S. military and not defendants.  As to false imprisonment,
plaintiffs' initially assert in their complaint that they were
"forcibly detained under United States custody in Iraq," First
Am. Compl. at ¶ 1, and that they were "detained, interrogated,
and physically abused by the Defendants and/or others while under
the custody and control of the Defendants," <u>e.g.</u>, <u>id.</u> at ¶ 32.
Those plaintiffs providing information on their arrests, however,
all indicate that they were arrested by U.S. or Iraqi
authorities, not defendants.  <u>See</u> First Am. Compl. at ¶ 31, 36,
40, 49, 54.  Plaintiffs have not responded to CACI's observation
that the complaint appears to implicate only the United States,
and not defendants, in their detention, Def. CACI Mot. Dismiss at
44-45, except to say that they "intend to amend the Amended
Complaint when additional facts are discovered with regard to

their claim[] for . . . false imprisonment." Pls.' Opp'n to Def.
CACI's Mot. Dismiss at 32 n.10.  If, and when, plaintiffs have a
justifiable basis on which to implicate these defendants in their
false imprisonment and conversion claims, they may seek leave to
amend their complaint.

## Diversity and Minimum Amount

Jurisdiction for plaintiffs' common law claims is based
on 28 U.S.C. § 1332.  That statute does not confer jurisdiction
over suits by a group consisting of only foreign persons against
another foreign person.  28 U.S.C. § 1332(a).  As plaintiffs are
aliens, their claims against defendant CACI N.V., which is
incorporated in the Netherlands, must be dismissed.  See JPMorgan
Chase Bank v. Traffic Stream (BVI) Infrastructure Ltd., 536 U.S.
88, 91 (2002) (entities incorporated in foreign countries are
foreign citizens for purposes of diversity analysis).[9]  As to
plaintiffs' failure to allege at least $75,000 in damages, 28
U.S.C. § 1332 (a), I find that it is in the interest of justice
to allow an amendment.

---

[9] At oral argument, counsel for CACI stated that CACI N.V.
was not involved in the interrogator contracts in question here.
4/21/05 Tr. at 26.  Further, counsel indicated that a CACI
company not named in the suit provided interrogators to the
military.  Id.

* * *

An appropriate order accompanies this memorandum.


                              JAMES ROBERTSON
                       United States District Judge